Dear Jeff:
You have requested a reconsideration of the original opinion herein which found the use of public funds by the Amite River Basin Commission for a public relations campaign to be unauthorized by statute. You have provided the minutes of the regular November 14, 1989 meeting of the commission which memorialize the decision of the commission to hire a public relations agency "for public relations assistance," and requested that the reconsideration opinion focus upon the language of the minutes and reach a specific conclusion as to whether the November 14, 1989 minutes evidence the performance of a prohibited act by the Amite River Basin Commission.
Opinion No. 90-126 answered, in the abstract, a narrow and hypothetical question of law, tendered in the abstract. Opinions of the Attorney General are conceptual; they cannot by their nature find facts, but only answer questions of law.
In reaching its conclusion that the use of public funds for a public relations campaign by state officers or agencies was unlawful unless expressly authorized by the constitution or by statute, the original opinion suffered a misleading ambiguity by its failure to distinguish between public relations and "public information". While the conclusion of the original opinion was correct and is hereby affirmed, the facial legality of the Amite River Basin Commission's action of November 14, 1989 can only be analyzed if the legal distinction between lawful public information and unlawful public relations is clearly elucidated. *Page 2 
The Louisiana Constitution of 1974 and the Election Code in Title 18 of the Revised Statutes clearly make this distinction with regard to elections on tax referenda, an issue which may be present in the commission's use of these public funds for public relations assistance. As the result, the distinction generally between the valid governmental function of public information
and the ultra vires activity of public relations is well settled in Louisiana law.
 La. Const. Art. XI, Sec. 4 (1974) provides:
 No public funds shall be used to urge any elector to vote for or against any candidate or proposition, or be appropriated to a candidate or political organization. This provision shall not prohibit the use of public funds for dissemination of factual information relative to a proposition appearing on an election ballot. (Emphasis added.)
This provision has been held to be self-operative, without need of enabling legislation. Godwin v. East Baton Rouge ParishSchool Board, et al., 372 So.2d 1060 (La.App. 1st Cir. 1979). Its violation gives rise to civil remedies; Godwin recognized the viability of causes of action for declaratory judgment and a money judgment for reimbursement of the public funds brought by taxpayers for violation of Art. XI, Sec. 4. Ibid. Such prohibited use of public funds would also create a civil cause of action for an injunction against prospective violations of the constitutional norm. Connick v. Lucky Pierre's, 331 So.2d 145
(La.App. 1st Cir. 1972).
Finally, because the duty created by Art. XI, Sec. 4 is self-operative, its breach may create criminal culpability under LSA-R.S. 14:134 (1)(2) (Malfeasance: a felony).
Godwin, by its interpretation of Art. XI, Sec. 4, concludes that at least with regard to tax referendum elections (or contemplated, planned elections), the line between legality and illegality is that between advocacy of only one side of the public issue through use of public funds and the neutral statement of facts pertinent to all sides of an issue and presented without bias. "Public relations" includes, but is not limited to, lobbying, which is advocacy directed toward government rather than the public at large. *Page 3 
The original opinion herein imputed the former meaning to "public relations" — that original American art which selects and contextualizes the facts or information communicated in order to create a desired body of public opinion which is favorable and compliant to the point of view or political entitlement of the public officer or public entity. Public relations in government generally results in the manipulation of public opinion for the benefit of some private or political goal. It is publicly financed political advocacy, and it is unfair and unlawful precisely because it deprives those citizens who are opposed to the private or political result sought, but at issue, of a level playing field with government. The prohibited advocacy in connection with elections explicated by Godwin's definition of urge in the constitutional provision may be adopted generally for definition of the distinction between public relations and public information. The legal authority for the latter activity of government is subsumed within the constitutional or statutory empowerment of that public officer's or public entity's authorized government function; whereas there is never legal authority for the use of public funds for the former (public relations advocacy) unless expressly authorized by the constitution or statutes. Godwin makes the first part of the distinction as follows:
 Urge as used in Art. XI, Sec. 4 means to promote, take a position favorable or opposed to a particular candidate or proposition, or openly and publicly seek the election or defeat of a particular candidate, or the passage or defeat of a proposition submitted to the electorate. Godwin, supra
at 1064. (Emphasis added.)
In a definition also adopted herein for general application to this issue without limitation to election campaigns, Godwin
ruled that for the expenditure of public funds to qualify for the public information exception to the prohibition of Art. IX, Sec. 4, the information compiled and communicated through the use of public funds must be free from the presence of all advocacy and argument. It cannot be selective in its presentation and contextualization of information and thereby present only one side of the issue. "Public information" may be also defined generally as that which Art. IX, Sec. 4 authorizes in election campaigns to be supported by public funds: *Page 4 
 . . . factual information relative to a proposition appearing on an election ballot [which] encompasses all empirical data required by the public to intelligently decide whether to vote for or against the issue. . . . Such information [must be] purely factual and suggest no position for or against and make it clear that the data is published and disseminated solely and only for informational purposes. Godwin, supra, at 1064 (Emphasis added.)
The Attorney General adopts the distinction between public relations and public information stated by the Louisiana Constitution, as interpreted and explained by the Godwin, and applies it to the question of the proper expenditure of public funds for communications activity by government in state government's ordinary, everyday course of business. Without specific, express authorization from the legislature by statute (i.e. drug education, economic development, etc.), the use of public funds to finance public relations techniques to manipulate public opinion on public issues to create a body of public opinion favorable to a public official or entity, is ultravires. The use of public funds to provide a public information function to a state office is integral to its constitutional and/or statutory power and function, and is lawful if its intent is to be factually informative to the public.
The public information function recognized as lawful here is not only consistent with democratic values but essential to conformation to them by government. Even the communist world, in its startling intended transformation into democratic polities, recognizes the essentiality of fact-based and honest information to the public from government — they call it glasnost.
Public trust requires the citizenry to have access to accurate information to evaluate and judge the honesty, fairness and efficiency of government. Fact-based information also facilitates public respect for the lawful exercise of authority by government, when such exercise of authority, if not understood, might be popularly contested or obstructed.
The legal issue here is teleological. The expenditure of public funds for this type of communications activity is not unlawful per se. It is the purpose for which the public funds *Page 5 
are spent, and the intent of the public agency or official which makes the expenditure, which controls the legal character of the expenditure. While intent must always be inferred from acts or circumstance, and its true nature difficult sometimes to precisely determine because it is a question of fact, nonetheless it serves as the test we herein adopt as the bright line between legality and illegality, both in election campaigns and in the general course of business by state government.
The Attorney General, in an earlier opinion personally written by Mr. Guste, has recognized this standard in his enforcement of "constitutional prohibitions against the use of public funds for private and political purposes." Opinion of the Attorney General No. 76-307.
The legal test stated by the Attorney General was reaffirmed in Opinion of the Attorney General No. 79-1191, which disallowed the use of public funds to pay for a newspaper advertisement addressing a proposed constitutional amendment. The Attorney General disallowed the use of public funds because "the proposed advertisement takes a stand in the support of passage of constitutional amendment No. 1 and does not desseminate purelyfactual information." (Emphasis added.)
Several other points should be made concerning the rule stated in this opinion and derived from the constitution, statutes and jurisprudence.
Art. XI, Sec. 4 is enabled by a statute in the Election Code, LSA-R.S. 18:1465. The statute duplicates the prohibitory language of the constitutional provision, but further provides a criminal penalty for its violation.
Violation of the Constitution or the Election Code provisions does not invalidate or delegitimate any election in which the illegal use of public funds occurred. Rather than nullification of the election results, the proper remedy in law is criminal prosecution. Concerned Business and Property Ownersof DeSoto, Inc. v. DeSoto Parish School Board, 528 So.2d 567
(La.App. 2nd Cir. 1988).
Violation of this rule may result in criminal penalities under another statute. LSA-R.S. 43:31D prohibits the use of public funds appropriated for printing for the partisan or public relations purposes prohibited by Art. XI, Sec. 4 and R.S.18:1465, subject to the same exception *Page 6 
authorizing the use of public funds to desseminate "factual information relative to a proposition on any election ballot." Violation of Sec. 31D creates culpability for a criminal penalty under R.S. 43:31F.
Finally, another constitutional provision justifies the extension of the legal standard of Art. XI, Sec. 4 to the general course of business by all governmental entities, state, local and parochial, including state boards, commissions and districts. La. Const. Art. VII, Sec. 14 (1974) characterizes as illegally gratuitous those expenditures of public funds which are not mandated by a legal obligation or subsumed by legal duty. Cityof Port Allen v. Louisiana Mun. Risk Management Agency Inc.,439 So.2d 399 (La. 1983). Without a legal obligation to engage in public relations created by a statutory delegation of the power and duty to do so by the legislature, neither the commission nor any other state officer and agency may do so. Because of the use of public funds, the lack of authority in the enabling statute identified as ultra vires in the original opinion rises to the level of a constitutional violation not limited to the presence of a tax referendum on a ballot as in the case of Art. XI, Sec. 4. No government entity or officer, without a legal obligation created by an authorizing statute, may use public funds to attempt to wrestle public opinion to rest on one side of a public issue of moment to the public interest or to government. The constitution denies the use of public funds to finance the advocacy of the self-interest of any state agency or officer. Lobbying is likewise barred where financed by public funds; it is but an included instance of the same malum prohibitum, except it is directed at manipulating and influencing government action rather than public opinion.
It is crucial to note that the core prohibition of the doctrine expounded herein is the use of public funds. The law values and protects the most passionate, eloquent and totally one-sided expression of conviction regarding public issues by both public officials and citizens alike. The members of the Amite River Basin Commission are constitutionally entitled, and protected, to make the most vociferous public argument possible for the construction of a reservoir to alleviate the profound drainage problem within their district — as long as they do not use public funds to potentiate their entreaty of the collective opinion of the electorate. Godwin carefully noted this point: *Page 7 
 . . . the provision [Art. XI, Sec. 4] is designed to prevent public officials from using public funds to support or oppose candidates, parties or propositions. We note particularly that the provision does not prohibit public officials from supporting or opposing candidates, parties or propositions with their personal funds and resources, which admittedly they have a right to do. It only prevents their doing so with public funds. Supra. at 1063. (Emphasis added.)
With regard to your opinion request, there is nothing facially illegal about the action of the commission that is memorialized in the November 14, 1989 minutes. There is nothing illegal in a state agency with statutory authority to ameliorate flooding and drainage problems to spend money for professional help in preparing a public information slide presentation which empirically and factually informs the citizenry and government officials of the actual nature of the flooding and drainage crisis in the Amite River Basin Drainage District, without seeking public or official support for the affirmative side of any tax referendum which must be electorally approved in order to authorize the levy of a 3 mill ad valorem tax under LSA-R.S.33:3309 to finance the construction a new reservoir to alleviate the flooding.
Hence it is superficial to judge the legality of the acts of the commission on the basis of the minutes alone. The correct legal question is not whether the funds were authorized but what was the nature of the slide presentation prepared by the public relations agency hired with public funds, and how was it used? Did it advocate the approval of a tax referendum to authorize a 3 mill ad valorem tax to generate sufficient revenue to build a reservoir? Did the slide presentation present the opposite view — the alternatives available to alleviate the flooding problem without an ad valorem tax or new reservoir?
Beyond the minutes you have supplied, I have no idea what the commission did or did not do. The minutes do not reflect the intent or purpose of the commission as to how the work product of the public relations agency would be used. Intent is a finding of fact, and that is beyond the authority of this opinion, which is restricted to questions of law. The *Page 8 
power to find facts is a judicial and a quasi-judicial one, and the question of intent must be deferred to the appropriate district court and district attorney, respectively.
However, until the appropriate judicial officer may find differently, the act of the Amite River Basin Commission in expending these funds for "public relations assistance" is presumed lawful, and the Attorney General so presumes. LSA-R.S.15:432.
Trusting this to be of sufficient information, I am
Sincerely,
 WILLIAM J. GUSTE, JR. Attorney General
 BY: CHARLES J. YEAGER
Assistant Attorney General
CJY: tm
STATE OF LOUISIANA One American Place DEPARTMENT OF JUSTICE 301 Main Street, Suite 600 CIVIL DIVISION P.O. Box 94005 BATON ROUGE TEL.:(504)342-7013 70804-9005 FAX.:(504)342-2090
 STATE OF LOUISIANA DEPARTMENT OF JUSTICE Baton Rouge Telephone: 504-342-7013